UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SABRINA E. BARNES,

                              Plaintiff,

        -v-

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

CIVIL ACTION NO.: 20 Civ. 1195 (SLC)

**OPINION & ORDER**

**SARAH L. CAVE,** United States Magistrate Judge.

## I.        INTRODUCTION

Plaintiff Sabrina E. Barnes ("Barnes") commenced this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended, 42 U.S.C. § 405(g).  She seeks review of the December 18, 2018 decision (the "Decision") by the Commissioner (the "Commissioner") of the Social Security Administration ("SSA"), denying her application for Disability Insurance Benefits ("DIB") under the Act.  (ECF No. 1).  Barnes contends that the Decision of the Administrative Law Judge ("ALJ") was not supported by substantial evidence and failed to apply the correct legal standard to the evidence.  (ECF No. 16).  Barnes asks the Court to vacate the Commissioner's Decision and remand the case for a new hearing.  (Id.)

The parties have cross-moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  On September 28, 2020, Barnes filed a motion for judgment on the pleadings ("Barnes' Motion" (ECF No. 15)), on November 25, 2020, the Commissioner filed its cross-motion (the "Commissioner's Motion" (ECF No. 17)), and on December 16, 2020 Barnes filed her reply (ECF No. 19).  For the reasons set forth below, the Commissioner's Motion is GRANTED and Barnes' Motion is DENIED.

## II.   **BACKGROUND**

### A. **Procedural History**

On November 8, 2016, Barnes filed an application for DIB[1] benefits, claiming that she had been medically unable to work since October 26, 2016.  (SSA Administrative Record ("R.") 141 (ECF No. 13 – 13-2)).  On February 6, 2017, the SSA denied her application, finding that she was not disabled.  (R. 10).  She appealed and requested a hearing before an ALJ.  (Id.)

On October 24, 2018, Barnes appeared before ALJ Kieran McCormack for an evidentiary hearing (the "Hearing").  (R. 42–79).  On December 18, 2018, the ALJ issued a finding that Barnes was not disabled under the Act.  (R. 10–23).  Although he found that Barnes had four severe impairments — migraines, sinusitis, allergies, and bipolar disorder (R. 13–14) — ALJ McCormack concluded that the severity of her impairments did not meet or medically equal the requisite criteria for finding a disability, and that she retained the residual functional capacity ("RFC") to perform certain jobs that existed in the national economy.  (R. 13–23).

On December 10, 2019, the SSA Appeals Council denied Barnes' request for review of the ALJ Decision.  (R. 1–5).

On February 11, 2020, Barnes filed the Complaint in this Court.  (ECF No. 1).  She argues that the ALJ Decision was not supported by substantial evidence because the ALJ failed to properly weigh the opinions of:  (1) treating physician Gary Rogg, M.D.; and (2) treating therapist Simon Bresler, LMSW.  (ECF No. 16).  The Commissioner argues that the ALJ Decision is supported by substantial evidence.  (ECF No. 17).

---

[1] In order to quality for DIB, one must be both disabled and insured for benefits.  42 U.S.C. § 423(a)(1)(A); 20 C.F.R. §§ 404.120, 404.315(a).  The last date a person meets the insurance requirement is the date by which the claimant must establish a disability.  Barnes met the insurance requirements through June 30, 2019, and thus her disability must have begun on or before that date to quality for DIB.  (R. 12).

B.  **Factual Background**

    1.  **Non-medical evidence**

Barnes was born in 1970 and was 46 years-old at the time of her application.  (R. 141).

She graduated from high school and resided in White Plains, New York with her teenage son.

(R. 63–64, 69, 141–42).  A typical day for her consisted of light housekeeping, cooking, watching

television and caring for her teenage son, including assisting him with his schoolwork.  (R. 63–

64).  Barnes generally avoided being outdoors during allergy season.  (R. 64).  Her employment

history, a subject of her Hearing testimony, is set forth below.  (See infra § II.C.1).

    2.  **Medical evidence**

Barnes and the Commissioner have both provided summaries of the medical evidence in

the record, which are largely consistent with one another.  (See ECF Nos. 16 at 5–14; 18 at 5–16).

Accordingly, the Court adopts both parties' summaries of the medical evidence as accurate and

complete and sets forth those additional facts relevant to the Court's analysis.  (See infra § III.B.1–

2).

C.  **Administrative Proceedings**

    1.  **Hearing before the ALJ**

On October 24, 2018, ALJ McCormack held the Hearing, at which Barnes was represented

by an attorney.  (R. 42).

Barnes testified that from 2006 through 2011 she worked as a teacher's aide assisting

children with disabilities.  (R. 48–49; see R. 161).  During 2015 and 2016, she worked in an

administrative role in the office of a hospice care company.  (R. 52–53).  In 2017, she worked part-time with a staffing agency.  (R. 54–55).

The ALJ asked Barnes why she left the hospice care company.  (R. 55).  She responded that she left in August 2016 because construction triggered her allergies, returned in October, but was terminated on October 30, 2016 because her employer did not believe she was "up to capacity of doing my job[.]"  (R. 55–56).  She testified that several days later a family member was struck by a car so she then cared for him and applied for unemployment benefits.  (R. 56). ALJ McCormack asked for clarification concerning Barnes' disability onset date of October 2016, in light of her testimony that her symptoms had persisted for approximately a decade.  (R. 60). Barnes responded, "I've been filing Social Security disability [applications] for years, and I keep getting denied . . . I've been losing jobs all the time, because I get sick."  (Id.)

Beginning in January 2018, Barnes attended a five-month medical coding and billing class, for which she received an entry-level certificate for medical coding.  (R. 67–68).

Barnes described suffering from allergies, sinusitis, migraine headaches, bipolar disorder, swelling to her body and neck, and back pain.  She testified that although she had suffered from allergies since childhood, they first became severe in her thirties.  (R. 56–59).  She described that her allergies triggered migraine headaches, which in turn caused light sensitivity, double vision, dizziness, vertigo, swelling to her body — particularly to her stomach and the left side of her body — and stress and feelings of panic (R. 56–58, 62).  Barnes described experiencing a migraine aura as "a constant squiggly on the sides of the eyes, and then [] double vision."  (R. 66).  She experienced headaches approximately four times monthly, each lasting several days to approximately one week.  (R. 58–59).  Coinciding with her migraines and allergies, she

experienced pain in her ear, for which she took ear drops, and, during allergy season, sinusitis, for which she was treated with biweekly fluid injections to relieve sinus pressure.  (R. 57–58, 65).

Barnes received physical therapy for neck and back pain, which was exacerbated by cold weather.  (R. 68–69).  She was prescribed several medications and received medical treatment for her impairments: Amitriptyline, an antidepressant, for her bipolar disorder; an omeprazole for her gastric impairments; cetirizine-D, an antihistamine, and Flonase for allergies; and Maxalt and Topamax for her migraines.  (R. 57, 61, 67).  The medications caused drowsiness.  (R. 60).

Barnes was hospitalized from August 25, 2016 until September 2, 2016 for a bipolar episode that she testified was caused by a migraine headache.  (R. 61).  She received psychiatric treatment beginning in approximately August 2016.  (R. 61–62).

Last, ALJ McCormack took testimony from vocational expert ("VE") Renee Jubrey.  (R. 69–76).  ALJ McCormack posed two hypotheticals to the VE.  First, he asked whether there were any jobs in the national economy for a hypothetical individual that could perform sedentary, low stress work, with simple, routine tasks, occasional interaction with others, and certain exertional limitations.[2]  (R. 69–70).  The VE testified that no jobs would exist for this hypothetical individual.  (R. 71).  The ALJ modified the hypothetical to account for an individual who could perform a full range of low stress work at all exertional levels with environmental limitations to extreme temperatures, exposure to humidity and airborne irritants, excessive noise and excessive light.  (Id.)  The VE testified that by contrast, there were jobs available for such an individual, such as a kitchen helper, store laborer, and cook helper.  (R. 72).  On follow-up questioning, the VE testified

---

[2] In this hypothetical the individual cannot climb, bend, balance, stoop, crouch, kneel, or crawl, but can occasionally reach in all directions and handle and feel with both hands occasionally.  (R. 70–71).

that the hypothetical individual would be incapable of fulltime employment if she were not limited to six hours per day of combined sitting and standing, or if she would regularly be absent from work twice monthly.  (R. 75–76).

### 2.  The ALJ Decision

On December 18, 2018, ALJ McCormack issued the Decision denying Barnes' application for DIB benefits and holding that she had not been under a disability from October 26, 2016. (R. 10–23).

ALJ McCormack followed the five-step disability determination process.  As a preliminary matter, the ALJ found that Barnes met the insured status requirements for her DIB application through June 30, 2019.  (R. 12).  At step one, ALJ McCormack found that Barnes had not engaged in substantial gainful activity since her alleged onset date, October 26, 2016.  (R. 13).  At step two, the ALJ determined that she had four severe impairments: migraines, sinusitis, allergies, and bipolar disorder.  (R. 13–14).  The ALJ deemed non-severe her gastroesophageal reflux disease ("GERD") "given the lack of abnormal clinical findings and infrequent complaints regarding symptoms[,]" and her bilateral congenital lymphedema,[3] which caused two discrete flare ups that were mitigated with treatment and did not cause any reduction in function (R. 13).  ALJ McCormack ruled out angioedema[4] as a severe impairment because there was no evidence that her abdominal swelling caused any functional limitations and there was no record of symptoms after September 2017.  (R. 14).  The ALJ also deemed Barnes' chronic neck and back pain to be

---

[3] Edema is "[a]n accumulation of an excessive amount of watery fluid in cells or intercellular tissues." Stedman's Medical Dictionary, 279130 (Nov. 2014 ed.) ("Stedman's").  Congenital lymphedema, in turn, is "permanent pitting edema usually confined to the legs[.]"  Stedman's, 516930 (hereditary lymphedema), 516920 (congenital lymphedema, which refers to hereditary lymphedema).

[4] Angioedema is a recurrent area of "subcutaneous or mucosal edema of sudden onset, usually disappearing within 24 hours; frequently, an allergic reaction to foods or drugs."  Stedman's, 39630.

non-severe because "physical and neurological examinations . . . by both treating and examining physicians never confirm[ed] any limitation in range of motion to the cervical spine or arms[,]" and no x-ray or MRI confirmed the existence of degenerative disc disease.  (Id.)

At step three, the ALJ found that Barnes did not have an impairment or a combination of impairments that met or medically equaled the severity of one of the listed impairments in the Act.  (R. 14–16).  (The impairments listed in 20 CFR Appendix 1, Subpart P, Part 404 are known as the "Listings").  The ALJ considered Listings 3.00, Respiratory Disorders, and 11.00, Neurological Disorders, in evaluating Barnes' allergies, sinusitis, and migraines, but determined that her impairments did "not exist at listing-level severity."  (R. 14).  ALJ McCormack also ruled out Listing 12.04, Mental Disorders, finding that the "paragraph B" and "paragraph C" criteria were not satisfied.  (R. 14–16).[5]

ALJ McCormack assessed Barnes' RFC as being able to perform a full range of low stress work at all exertional levels with various nonexertional limitations, particularly to environmental irritants and allergens.[6]  (R. 16).  The ALJ concluded that her allergies, sinusitis, and migraine symptoms required environmental limitations to her exposure to fumes, temperature extremes, excessive noise and vibration, bright lights, dust, mold, and paint vapors.  (R. 20–21).  Relatedly,

---

[5] ALJ McCormack found that the "paragraph B" criteria were not met because Barnes' mental impairments did not cause at least one extreme or two marked limitations in a broad area of functioning, including understanding, remembering or applying information, interacting with others, concentrating or maintaining pace or adapting or managing herself.  (R. 14–15).  He determined that the "paragraph C" criteria were not satisfied because Barnes' mental impairments were not "serious and persistent" with evidence of only marginal adjustment with ongoing treatment. (R. 15–16); see Listing 12.04, 20 C.F.R. Pt. 404, Subpt. P, App. 1.

[6] Low stress jobs are those which involve simple work-related decisions, routine tasks, minimal workplace changes and only occasional interaction with others.  (R. 16).  The nonexertional limitations ALJ McCormack imposed included limiting exposure to extremes of temperature, noise, vibration, light, humidity and airborne irritants.  (Id.)

he observed that "there is a seasonal aspect to all of [Barnes'] physical impairments, and large swaths of the record where [she] did not complain about them." (R. 20). The ALJ accounted for her bipolar disorder by addressing in the RFC her limitations in concentration, memory, persistence, adaptation and social interaction. (R. 21).

In determining the RFC, ALJ McCormack summarized and evaluated the medical records of five treating sources and three consultative examiners. (See R. 16–21). The ALJ noted that Barnes' neurological and mental status examinations by Dr. Robert Fekete were "entirely normal," and she stated in early 2018 that Maxalt "worked well" to ward off her headaches. (R. 18). The ALJ accorded significant weight to Dan Moskowitz, M.D., a treating allergist with whom Barnes had "many contacts," who opined that her sinusitis required limitations in exposure to certain irritants. (R. 17–18). Likewise, the ALJ accorded significant weight to the "completely benign" consultative internal medicine examination of Julia Kaci, M.D., who opined that Barnes should avoid bright lights, noisy environments, and weather extremes as potential migraine triggers. (R. 18). This opinion, the ALJ found, was well supported by the physical examination results, Barnes' allegations, and the medical record. (Id.)

The ALJ noted that Mr. Bresler, Barnes' therapist, documented that she was stable and making progress toward treatment goals, which was contrary to his November 5, 2018 "Medical Assessment of Ability to do Work Related Activities" (the "November 2018 Assessment") in which he found significant limitations in most aspects of occupational adjustment. (R. 17, 19–20, 679–80). According "little weight" to Mr. Bresler's opinion, the ALJ found the November 2018 Assessment "inconsistent with his own contemporaneous findings[,]" unsupported by clinical findings, and inconsistent with other record evidence. (R. 19–20). ALJ McCormack also

determined that because Mr. Bresler had not conducted a mental status examination since October 2016 — more than two years before the November 2018 Assessment — "[Bresler] did not have a longitudinal understanding of [Barnes'] history and symptoms at the time he composed th[e] medical source statement."  (R. 19).

ALJ McCormack accorded little weight to the opinion of Barnes' treating internist, Dr. Rogg.  (R. 19).  Dr. Rogg asserted in his October 11, 2018 Medical Source Statement (the "Medical Source Statement") that Barnes could stand, walk, and sit for a combined total of only six hours per workday due to degenerative disc disease of the neck and edema in the legs, could lift a maximum of ten pounds and was otherwise severely limited in her physical abilities.  (Id.; see R. 626–27).  The ALJ found this opinion inconsistent with Dr. Rogg's records, because "all [Dr. Rogg's] physical examinations of [her] have been normal."  (R. 19).  ALJ McCormack also found Dr. Rogg's opinion inconsistent with the examination and conclusions of Dr. Kaci and the October 2017 physical therapy discharge notation that Barnes was "fully functional in her lower extremities."  (R. 19, 299–302, 364).

The ALJ also considered the consultative psychiatric evaluation of Melissa Antiaris, Psy.D. and the opinion of state agency psychiatric consultant Dr. G. Kleinerman.  (See R. 18–19).  The ALJ accorded significant weight to Dr. Antiaris' determination that Barnes had certain mild limitations in relating with others and dealing appropriately with stress, and Dr. Kleinerman's related opinion.  (R. 18–19, 89–90, 294–97).  By contrast, the ALJ accorded little weight to Dr. Antiaris' opinion that these limitations would not interfere with Barnes' daily functioning, concluding instead that the totality of the evidence "shows that [Barnes] has psychiatric limitations" which he accounted for in the RFC.  (R. 18; see R. 296–97).

At step four, ALJ McCormack found that Barnes was unable to perform any past relevant work due to the mental restrictions imposed in her RFC.[7]  (R. 21).  At step five, ALJ McCormack found that there were jobs in the national economy that she could perform, considering her age, education, work experience and RFC.  (R. 22–23).  Accordingly, the ALJ determined that she was not disabled.  (Id.)

### 3.  The Appeals Council Decision

On December 10, 2019, the SSA Appeals Council denied Barnes' request for review of ALJ McCormack's Decision.  (R. 1–5).

## III.   DISCUSSION

### A.  Applicable Legal Standards

### 1.  Standard of Review

Under Rule 12(c), a party is entitled to judgment on the pleadings if she establishes that no material facts are in dispute and that she is entitled to judgment as a matter of law.  See Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999); Morcelo v. Barnhart, No. 01 Civ. 743 (RCC) (FM), 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003).

The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  A court may set aside the Commissioner's decision denying SSI benefits if it is not supported by substantial evidence or was based on legal error.  See Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009).  Judicial review, therefore, involves two levels of inquiry.  First, the Court must decide whether the ALJ applied

---

[7] Barnes had past relevant work as a medical secretary, childcare attendant, and clerk.  (R. 21); see 20 C.F.R. § 404.1565.

the correct legal standard.  See Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254 (SCR) (MDF), 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008).  Second, the Court must decide whether the ALJ's Decision was supported by substantial evidence.  Id.  "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  Longbardi v. Astrue, No. 07 Civ. 5952 (LAP), 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (internal citations omitted).  The substantial evidence test applies not only to the factual findings, but also to the inferences and conclusions drawn from those facts.  See, e.g., Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999).  In determining whether the administrative record contains evidence to support the denial of claims, the Court must consider the whole record, and weigh all evidence to ensure that the ALJ evaluated the claim fairly.  See, e.g., Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999).  The Commissioner, not the Court, resolves evidentiary conflicts and appraises the credibility of witnesses, including the claimant.  See, e.g., Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

Disability-benefits proceedings are non-adversarial in nature, and therefore, the ALJ has an affirmative obligation to develop a complete administrative record, even when the claimant is represented by counsel.  See Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508–09 (2d Cir. 2009).  To this end, the ALJ must make "every reasonable effort" to help an applicant get medical reports from her medical sources.  20 C.F.R. § 404.1512(b).  Ultimately, "[t]he record as a whole must be

complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity." Casino-Ortiz v. Astrue, No. 06 Civ. 155 (DAB) (JCF), 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007).  When there are inconsistencies, gaps, or ambiguities in the record, the regulations give the ALJ options to collect evidence to resolve these issues, including re-contacting the treating physician, requesting additional records, arranging for a consultative examination, or seeking information from others.  20 C.F.R. § 404.1520b.

The Act authorizes a court, when reviewing decisions of the SSA, to order further proceedings:  "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); see Butts v. Barnhart, 388 F.3d 377, 382 (2d Cir. 2004).  If "'there are gaps in the administrative record or the ALJ has applied an improper legal standard,'" the Court will remand the case for further development of the evidence or for more specific findings. Rosa v. Callahan, 168 F.3d 72, 82–83 (2d Cir. 1999) (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)).  Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. Pratts, 94 F.3d at 39.  If, however, the reviewing court concludes that an ALJ's determination to deny benefits was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate.  See, e.g., Butts, 388 F.3d at 386 (discussing Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000)).

     2.      **Standards for benefit eligibility**

For purposes of SSI and DIB benefits, one is "disabled" within the meaning of the Act, and thus entitled to such benefits, when she is "unable to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected
to result in death or which has lasted or can be expected to last for a continuous period of not
less than twelve months."  42 U.S.C. § 1382c(3)(A).  The Act also requires that the impairment be
"of such severity that [the claimant] is not only unable to do his previous work but cannot,
considering his age, education, and work experience, engage in any other kind of substantial
gainful work which exists in the national economy."  42 U.S.C. § 1382c(3)(B).  In reviewing a claim
of disability, the Commissioner must consider:  "(1) objective medical facts; (2) diagnoses or
medical opinions based on those facts; (3) subjective evidence of pain and disability testified to
by claimant and other witnesses; and (4) the claimant's background, age, and experience."
Williams ex rel. Williams v. Bowen, 859 F.2d 255, 259 (2d Cir. 1988).

Under the applicable regulations, an alleged disability is evaluated under the sequential
five-step process set forth in 20 C.F.R. § 404.1520(a)(4)(i)–(v).  The Second Circuit has described
the process as follows:

> First, the Secretary considers whether the claimant is currently engaged in
> substantial gainful activity.  If not, the Secretary next considers whether the
> claimant has a "severe impairment" which significantly limits his physical or
> mental ability to do basic work activities.  If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on the medical evidence,
> the claimant has an impairment which is listed in Appendix 1 of the regulations.  If
> the claimant has such an impairment, the Secretary will consider him disabled
> without considering vocational factors such as age, education, and work
> experience; the Secretary presumes that a claimant who is afflicted with a "listed"
> impairment is unable to perform substantial gainful activity.  Assuming the
> claimant does not have a listed impairment, the fourth inquiry is whether, despite
> the claimant's severe impairment, he has the residual functional capacity to
> perform his past work.  Finally, if the claimant is unable to perform his past work,
> the Secretary then determines whether there is other work which the Claimant
> could perform.

Bush v. Shalala, 94 F. 3d 40, 44–45 (2d Cir. 1996) (quoting Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983)).

At the first four steps, the claimant bears the burden of proof.  At the fifth step, the burden shifts to the Commissioner to demonstrate that there are jobs in the national economy that the claimant can perform.  See, e.g., Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).  In meeting the burden of proof at the fifth step, the Commissioner can usually rely on the Medical-Vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, known as "the Grid." Zorilla v. Chater, 915 F. Supp. 662, 666–67 (S.D.N.Y. 1996).

### 3.   Treating Physician Rule[8]

The regulations require the ALJ to give "controlling weight" to "the opinion of a claimant's treating physician as to the nature and severity of the impairment . . . so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  Burgess, 537 F.3d at 128 (internal citation omitted); accord Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 426 (S.D.N.Y. 2010).  "This preference is generally justified because treating sources are likely to be 'the medical professionals most able to provide a detailed, longitudinal picture' of a plaintiff's medical impairments and offer a unique perspective that the medical tests and SSA consultants are unable to obtain or communicate."

---

[8] The Court notes that "[i]n March 2017, the Social Security Administration published regulations that effectively abolished the Treating Physician Rule for claims filed on or after March 27, 2017."  Dorta v. Saul, No. 19 Civ. 2215 (JGK) (RWL), 2020 WL 6269833, at *3 n.8 (S.D.N.Y. Oct. 26, 2020).  Under the new regulations, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."  20 C.F.R. § 404.1520c(a).  Because Barnes filed her claim in 2016 (see R. 10, 141), the Treating Physician Rule remains applicable.

Correale-Engelhart, 687 F. Supp. 2d at 426 (quoting 20 C.F.R. § 416.927([c])(2)); see 20 C.F.R. § 404.1527.

If the ALJ determines that a treating physician's opinion is not controlling, he is nevertheless required to consider the following factors in determining the weight to be given to that opinion:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence provided to support the treating physician's opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is from a specialist; and (6) other factors brought to the Commissioner's attention that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(c).  The ALJ must give "good reasons" for not crediting the plaintiff's treating physician.  20 C.F.R. § 404.1527(c)(2); see Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (explaining that Appeals Council had "an obligation to explain" the weight it gave to the opinions of the non-treating physicians).  After considering these factors, the ALJ must fully set forth his reasons for the weight assigned to the treating physician's opinion.  Burgess, 537 F.3d at 129.

While the ultimate issue of disability is reserved to the Commissioner, the regulations make clear that opinions from one-time examining sources that conflict with treating source opinions are generally given less weight.  20 C.F.R. § 404.1527(c)(2).  See also Selian v. Astrue, 708 F.3d 409, 419 (2d Cir. 2013) ("ALJs should not rely heavily on the findings of consultative physicians after a single examination."); Cabreja v. Colvin, No. 14 Civ. 4658 (VSB), 2015 WL 6503824, at *30 (S.D.N.Y. Oct. 27, 2015) (explaining that opinions of one-time consultants should not overrule those provided by the treating medical sources unless there are "serious errors" in

treating sources' opinions).  Failing to apply proper weight to a treating physician's opinion is reversible error.  See Greek v. Colvin, 802 F.3d 370, 376 (2d Cir. 2015).

### 4.    Assessing a claimant's subjective allegations

In considering a claimant's symptoms that allegedly limit his or her ability to work, the ALJ must first determine "whether there is an underlying medically determinable physical or mental impairment(s) — i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques — that could reasonably be expected to produce the claimant's pain or other symptoms." 20 C.F.R. § 404.1529(c).  If such an impairment is found, the ALJ must next evaluate the "intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations."   20 C.F.R. § 404.1529(c)(1).  To the extent that the claimant's expressed symptoms are not substantiated by the objective medical evidence, the ALJ must evaluate the claimant's credibility.  See Meadors v. Astrue, 370 F. App'x 179, 183–84 (2d Cir. 2010); Taylor v. Barnhart, 83 F. App'x 347, 350–51 (2d Cir. 2003).

Courts have recognized that "the second stage of [the] analysis may itself involve two parts."  Sanchez v. Astrue, No. 07 Civ. 931 (DAB), 2010 WL 101501, at *14 (S.D.N.Y. Jan. 12, 2010).  "First, the ALJ must decide whether objective evidence, on its own, substantiates the extent of the alleged symptoms (as opposed to the question in the first step of whether objective evidence establishes a condition that could 'reasonably be expected' to produce such symptoms)."  Id. "Second, if it does not, the ALJ must gauge a claimant's credibility regarding the alleged symptoms by reference to the seven factors listed [in 20 C.F.R. § 404.1529(c)(3)]."  Id. (citing

Gittens v. Astrue, No. 07 Civ. 1397 (GAY), 2008 WL 2787723, at *5 (S.D.N.Y. June 23, 2008)).  If the ALJ does not follow these steps, remand is appropriate.  Id. at *15.

When a claimant reports symptoms that are more severe than medical evidence alone would suggest, SSA regulations require the reviewing ALJ to consider specific factors in determining the credibility of the claimant's symptoms and their limiting effects.  SSR 96-7p, 1996 WL 374186, at *2 (superseded by SSR 16-3p for cases filed after March 27, 2017).  These seven factors include:  (1) an individual's daily activities; (2) the location, duration, frequency and intensity of pain or other symptoms; (3) factors that precipitate and aggravate those symptoms; (4) the type, dosage, effectiveness, and side effects of medication that the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual receives or has received for pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  See Bush, 94 F.3d at 46 n.4.

**B.  Evaluation of the ALJ's Decision**

The ALJ evaluated Barnes' claim pursuant to the five-step sequential evaluation process outlined in 20 C.F.R. § 404.1520(a)(4) and concluded that she was not disabled within the meaning of the Act.  (R. 10–23).  The Court finds that ALJ McCormack's thorough and well-reasoned Decision applied the correct legal standards, weighed the medical and opinion evidence properly, and was supported by substantial evidence.

### 1. **Physical RFC**

#### a. **Barnes' arguments**

Barnes argues that the ALJ's physical RFC determination is not supported by substantial evidence because the ALJ failed to properly weigh the opinion of Dr. Rogg, her treating physician, whose Medical Source Statement sets forth significant exertional limitations.[9]  (ECF No. 16 at 15–17).  Dr. Rogg diagnosed Barnes in the Medical Source Statement with chronic/episodic migraine, degenerative joint disease of the neck, lower extremity edema and recurrent allergies.  (R. 627).  He noted that Barnes' limitations have been "progressive since 2005," and in fields for medical and clinical findings supporting his assessment, wrote "pain with recurrent neck pain, recurrent migraine" and "recurrent evaluation by neurology, physical tx [treatment], orthopedist and rheumatology."  (R. 626–27).

Barnes argues that under the treating physician rule, Dr. Rogg's opinion, set forth in the Medical Source Statement, should have been accorded greater weight, as consistent with his own findings of degenerative disc disease and leg edema, and with other record evidence, including Barnes' testimony, findings by Dr. Fekete that she had migraines, Dr. Rosentreich's treatment of her edema, and a lymphedema evaluation at the Physical Medicine and Rehabilitation Department of White Plains Hospital.  (ECF No. 16 at 16–17) (citing R. 56–57, 371, 373, 382, 630, 657–58).  Further, Barnes argues that although the ALJ did not find her degenerative joint disease or leg edema severe at step two, ALJ McCormack should nevertheless have considered all impairments in determining her RFC.  (Id. at 17–18).

---

[9] Among other limitations, Dr. Rogg opined that Barnes was incapable of ever lifting more than ten pounds, could never climb, bend, balance, stoop, crouch, kneel or crawl, and could neither sit nor stand for more than three hours total in a workday.  (R. 626–27).

### b.  Commissioner's arguments

The Commissioner argues that the ALJ's RFC determination was supported by substantial evidence, as the ALJ properly weighed the evidence and evaluated the medical opinions.  The Commissioner argues that the ALJ was legally and factually justified in assigning Dr. Rogg's opinion little weight because it was not well-supported, was inconsistent with his own findings and was inconsistent with other record evidence.  (ECF No. 18 at 21–25).  First, Dr. Rogg's treatment notes "showed mostly normal clinical findings," undermining his opinion of extensive limitations.  (Id. at 23) (citing R. 19).

Second, the Commissioner argues that Dr. Rogg's opinions were contradicted by Dr. Kaci's clinical findings and her opinion that Barnes had no exertional limitations, and by treatment notes from other sources showing "that [Barnes'] headaches, leg edema and allergies had a seasonal component and responded to treatment."  (ECF No. 18 at 24) (citing R.  19).

Finally, the Commissioner argues that ALJ McCormack appropriately considered the six regulatory factors in determining the weight to accord Dr. Rogg's opinion and articulated good reasons for assigning her opinion little weight.  (ECF No. 18 at 25) (citing R. 19); 20 C.F.R. §§ 404.1527(c); 416.927(c).

### c.  Physical RFC applied

The Court concludes that ALJ McCormack's residual functional capacity determination was supported by substantial evidence and that the ALJ properly found that Dr. Rogg's opinion was not entitled to controlling weight.

First, the ALJ reasonably concluded that Dr. Rogg's opinion was "inconsistent with his clinical findings[.]" (R. 19). Several examples are illuminating. Dr. Rogg noted in his Medical Source Statement that Barnes had degenerative joint disease of the neck and "recurrent neck pain," and based his asserted limitations in sitting more than three hours on "eval of neck DJD." (R. 626–27). These conclusions were inconsistent with his treatment records, which did not document any positive findings concerning her neck or support a diagnosis of degenerative joint disease. (See R. 375–83).[10] Relatedly, Dr. Rogg predicated limitations in walking and standing more than three hours total in an eight-hour workday on Barnes' lower extremity edema (R. 627), but this finding was also unsupported by his treatment records. Although on June 8, 2017, Dr. Rogg found that Barnes had "trace-1 plus edema left,"[11] there was no edema at follow-up appointments on July 6, 2017 or February 20, 2018. (See R. 376, 378–79, 381–82). Based on these inconsistencies, the ALJ was justified in not according Dr. Rogg's opinion controlling weight. See Cichocki v. Astrue, 534 F. App'x 71, 75 (2d Cir. 2013) ("Because [the doctor's] medical source statement conflicted with his own treatment notes, the ALJ was not required to afford his opinion controlling weight."); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (explaining that under Second Circuit precedent, a treating physician's opinion is not afforded controlling weight where it is inconsistent with other substantial evidence in the record).

---

[10] An examination on June 8, 2017 documented Barnes' neck was supple with full range of motion; she denied backache, muscle pain, limitation of joint or muscle movement, aches, or cramps, although she admitted joint stiffness or pain. (R. 381–83). Similarly, on July 6, 2017, an examination documented her neck was normal, with full range of motion, and Barnes again denied limitations of joint or muscle movements, muscle pain, aches, or cramps or swelling, but admitted joint stiffness or pain. (R. 378–80). At her annual physical examination on February 20, 2018, she denied any muscle pain, aches, cramps, joint stiffness, limitation of joint or muscle movement or swelling, and an examination of her neck again showed it to be normal, with full range of motion. (R. 375–77).

[11] In the "most widely-used" technique for quantitatively measuring edema, "an examiner applies pressure with his/her index finger to a single location . . . captur[ing] pit depth and the time needed for

Second, the ALJ was justified in assigning little weight to Dr. Rogg's opinion as it was inconsistent with the other record evidence.  (R. 19).  See Burgess, 537 F.3d at 128 (noting that under the C.F.R., the ALJ may assign less than controlling weight to a treating physician's opinion that is "inconsistent with the other substantial evidence in [the] case record.").  The ALJ noted that, in contrast to the significant limitations asserted by Dr. Rogg, Barnes' October 26, 2017 physical therapy discharge form documented that her "pitting pedal edema resolved.  [She was] fully functional [in] LE's [lower extremities]."  (R. 364; see R. 19).  As ALJ McCormack recognized in formulating the RFC, Dr. Rogg's opinion was also inconsistent with the "normal" January 18, 2017 internal medicine examination by Julia Kaci, M.D.  (R. 19) (citing R. 299–302).  Dr. Kaci found no edema or other abnormalities to the extremities or skin, and concluded in her medical source statement that the only necessary limitations were that Barnes "should avoid bright lights, noisy environments, and extremes of weather as potential triggers for her migraine headaches." (R. 302).  The ALJ accounted for these findings in formulating the RFC.  (See R. 20–21).

Dr. Rogg's opinion was also inconsistent with the findings of Dr. Rosenstreich, an allergist who treated Barnes on two occasions in 2017, and documented in his final progress note, dated September 13, 2017, that "since last visit, August 10, 2017, patient reports that all swelling has resolved."  (R. 637).  As recognized by Drs. Kaci and Rosenstreich, environmental irritants and allergens accounted for her impairments, which could be mitigated by avoiding potential triggers and by medication management.  (See R. 302, 632–46).  Thus, the ALJ recognized that her treatment for her allergies, sinusitis and migraines "was generally routine and conservative,

---

the skin to return to its original appearance (recovery time) as a single edema score ranging from 0 to 4." Kimberly G. Brodovicz, et al., Reliability and Feasibility of Methods to Quantitatively Assess Peripheral Edema, 7 CLINICAL MED. & RSCH. No. 1/2, 21, 22 (2009).

consisting of turbinate injections and medication management," and accounted for these impairments with the environmental limitations in the RFC.  (R. 20–21).

Accordingly, the Court finds that ALJ McCormack appropriately evaluated the medical and opinion evidence concerning Barnes' physical impairments, and the ALJ's Decision was supported by substantial evidence in this regard.

As set forth infra § III.B.2.c, the Court also concludes that the ALJ appropriately evaluated the evidence concerning her mental impairments.

### 2.  Mental RFC

#### a.  Barnes' arguments

Barnes argues that the mental RFC determination is not supported by substantial evidence because the ALJ failed to properly weigh the opinion of therapist Simon Bresler, who treated her in 35 therapy sessions between September 2016 and September 2018.  (ECF Nos. 16 at 20; 19 at 3).  Barnes argues that remand is warranted because "the ALJ simply picked and chose evidence" to support his conclusion that Barnes was not significantly limited.  (ECF No. 16 at 24). To the contrary, Mr. Bresler's "consistent" treatment records were clear that "therapy was absolutely necessary to maintain treatment gains, keep mental stability and continue combatting bipolar symptoms[,]" and Mr. Bresler documented that she was repeatedly hospitalized due to manic symptoms and paranoia, which appeared to be precipitated by stress, allergies and migraines.  (Id. at 23–24).

Bipolar disorder, Barnes argues, renders an individual vulnerable to fluctuating and violent mood swings, and therefore "stability on some days does not necessarily support the conclusion that [she] is able to work every day."  (ECF No. 19 at 3) (citing Matta v. Astrue, 508 F.

App'x 53, 57 (2d Cir. 2013)).   Accordingly, Mr. Bresler's longitudinal view of her illness and limitations was entitled to greater weight.  In particular, the November 2018 Assessment set forth extreme limitations, including "poor to no[]" ability to interact with a supervisor, deal with work stress, maintain attention and concentration, use judgment, understand, and remember and carry out simple job instructions.  (R. 679–80; see R. 19–20).  In a field calling for the medical and clinical findings supporting these assessments, Mr. Bresler wrote, "[Barnes] deal[s] with chronic symptoms of Bipolar 1 disorder which affects her ability to maintain stable health which would allow her to work consistently."  (R. 679).

According to the November 2018 Assessment, Barnes was unable to behave in an emotionally stable manner and her limitations have been present since September 2016. (R. 680).

### b.  The Commissioner's arguments

The Commissioner argues that the ALJ's determination was supported by substantial evidence, as the totality of the record showed that "[she] was stable with treatment, generally understood her triggers, learned coping mechanisms, and successfully coped with stress.  (ECF No. 18 at 25) (citing R. 257–89, 521–625)).  The Commissioner maintains that the ALJ properly found that Mr. Bresler's opinion was unsupported by his own clinical findings, and inconsistent with other record evidence, including the clinical findings and opinions of Drs. Antiaris and Kleinerman.  (Id. at 25–28).  Moreover, the Commissioner argues that the ALJ properly accounted for her wide range of activities in formulating the RFC, including attending a medical coding and billing class for many months, which required the ability to understand and perform simple tasks, maintain concentration, interact with others and deal appropriately with stress during the time

period of purported disability, as well as performing household tasks, driving, taking public transportation, shopping and socializing with friends.  (Id. at 26–27).

### c.  Mental RFC applied

ALJ McCormack carefully reviewed the medical and opinion evidence and supported his RFC findings with detailed discussion and citation to the record.  (See R. 16–21).  The Court concludes that the ALJ appropriately accorded little weight to treating therapist Mr. Bresler's opinions of extreme mental health limitations attributed to her bipolar 1 disorder.

As Barnes recognizes (see ECF No. 16 at 21–25), "[l]icensed clinical social workers are not 'acceptable medical sources' due controlling weight under the treating physician rule, but they are still 'important' 'other sources' to whom the ALJ should look to show the severity of a claimant's impairments or ability to work."  Drysdale v. Colvin, No. 14 Civ. 1722 (SN), 2015 WL 3776382, at *4 (S.D.N.Y. June 16, 2015) (citing Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995); Social Security Ruling ("SSR") 06-03P, 2006 WL 2329939, at 2–3 (Aug. 9, 2006) (identifying licensed clinical social workers as "not 'acceptable medical sources'").

Here, in assessing the RFC, the ALJ adequately considered Mr. Bresler's records and opinion as an "important" source, although one he ultimately found warranting little weight.  ALJ McCormack considered all of Barnes' medical records, including for multiple psychiatric hospitalizations, including a week-long hospital admission in August 2016 "for treatment of bipolar disorder, which [she] stated [was] exacerbated by her migraines, which were, in turn, exacerbated by her allergies."  (R. 17).  ALJ McCormack recognized the frequency of Mr. Bresler's treatment of Barnes, reviewed her underlying treatment records and considered the consistency of Mr. Bresler's opinion with the record as a whole.  (R. 17–20).  After undertaking this review,

the ALJ accorded little weight to Mr. Bresler's opinion, finding that the significant asserted limitations were internally inconsistent with the "normal findings" of the four mental status examinations he did perform, except for subjective reports of agitation, anxiety, and paranoia. (R. 19; see 261–64 (October 24, 2016 examination), 266–68 (September 26, 2016 examination), 270–72 (October 6, 2016 examination), 274–76 (October 20, 2016 examination)).   ALJ McCormack noted too that these four mental status examinations were conducted between September and October 2016 — more than two years before the November 8, 2018 medical assessment.  (R. 19).  ALJ McCormack also observed that Mr. Bresler "failed to cite any clinical findings in support of his opinions, even though such was requested, and space was provided for such in the opinion form."  (R. 20; see R. 679–80).  Mr. Bresler instead wrote only that Barnes "deal[s] with chronic symptoms of Bipolar 1 disorder which affects her ability to maintain stable health which would allow her to work consistently."  (R. 679).  ALJ McCormack found that this opinion to be vague and conclusory, and inconsistent also with Dr. Antiaris's psychiatric evaluation.  (R. 20).

In light of the inconsistencies both internally and with other evidence, the ALJ could afford only little weight to Mr. Bresler's opinion.   See Cichocki, 534 F. App'x at 75 (affirming determination that bipolar disorder was not a severe impairment where the treating physician's opinion conflicted with treatment notes, which provided that apart from several episodes of decompensation, plaintiff's bipolar disorder was effectively managed with medication and therapy, and inconsistent with an expert opinion).

Further, ALJ McCormack appropriately accorded little weight to Mr. Bresler's opinion given that Barnes was repeatedly characterized as stable and managing stress appropriately (see

R. 265, 544, 553, 596, 598, 600, 604, 606, 608, 612, 624) and was capable of completing a five-month long medical billing class in January 2018 — during the period of asserted disability.  (R. 17, 67–68); see Monroe v. Comm'r of Soc. Sec., 676 F. App'x 5, 7–8 (2d Cir. 2017) (holding that ALJ properly rejected physician's opinion that plaintiff had little ability to deal with stress or to behave in a stable manner given the substantial contradictory evidence, including "more frequent" notations that plaintiff was stable, and plaintiff engaged in a range of recreational activities); cf. Cherry v. Comm'r of Soc. Sec. Admin., 813 F. App'x 658, 661–62 (2d Cir. 2020) (finding substantial evidence supported the ALJ's determination that bipolar disorder was not severe in light of evidence that medication management was helping and claimant maintained normal activities of daily living); Wat v. Colvin, No. 15-CV-5304 (ADS), 2017 WL 1379354, at *4–5 (E.D.N.Y. Apr. 15, 2017) (affirming denial of benefits for plaintiff with bipolar disorder when the ALJ limited the RFC to "work that involved only simple tasks and instructions; low stress, . . . and only occasional social interaction).

Even though there is some evidence in the record to support the limitations asserted by Mr. Bresler — including instances where Barnes suffered manic episodes or psychiatric decompensation and was hospitalized, and notations that she had "occasional hallucinations when entering a manic episode" (see R. 37, 272, 553, 567) — the ALJ's decision to accord little weight to Mr. Bresler's opinion is nevertheless substantially supported by the record, because "genuine conflicts in the medical evidence are for the Commissioner to resolve." Monroe, 676 F. App'x at 8 (internal citation omitted) (affirming ALJ's decision not to give controlling weight to

the opinion of bipolar claimant's treating physician that claimant would be off-task 30–50% of the time, but described claimant as stable "most of [the] time").

*          *          *

As required, the Court also reviewed the entire record, considered evidence from both sides, and concluded that substantial evidence supports the ALJ's decision. Thus, his findings are conclusive. See 42 U.S.C. § 405(g) (the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."); see also Longbardi, 2009 WL 50140, at *21 ("In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."). The Court is satisfied that ALJ McCormack's decision is supported by substantial evidence in the record, such that a remand for further evidentiary proceedings is not appropriate.

## IV.    CONCLUSION

For the reasons set forth above, the Commissioner's Motion (ECF No. 17) is GRANTED and Barnes' Motion (ECF No. 15) is DENIED.

The Clerk of Court is respectfully directed to close ECF Nos. 15 and 17.


Dated:        New York, New York
              August 24, 2021

SO ORDERED.

SARAH L. CAVE
United States Magistrate Judge